E. C. Ross *v.* C. R. Nesmith et al.

Husband and Wife — Personal Property Accruing During Coverture.

> Personal property accruing to the wife during coverture, before the Act of 1839 in relation to property of married women, vested in the husband, whether reduced to possession or not.[1]

Ejectment by appellee, Mrs. E. C. Ross, against appellants, to recover possession of the lands in Claiborn county, described in

---

[1]
By the common law, the husband, by the marriage, acquired an absolute right to all the personalty of the wife, and he might sue for it and recover possession of it in his own name. Magruder *v.* Stewart, 4 How, 204; Cable *v.* Martin, 1 How, 558; Lowry *v.* Houston, 3 How, 394.

Marriage operated as a gift to the husband of all the wife's personalty then in her possession, or which he should reduce into his possession during the

the declaration. From verdict and judgment for defendants, plaintiff appeals.

It appears from the evidence and the admitted facts that Adam Gordon died in 1836, leaving a last will and testament. He had owned a large tract of land in Claiborn county, which he sold before his death to one Passmore Hoopes for a sum aggregating nearly $100,000, taking in payment a residence, not in controversy, and one note for $46,000, and four other notes of $14,000 each, reserving a vendor's lien on the land to secure the deferred payments. These notes constituted the bulk of his estate at the time

coverture. Killcrease v. Killcrease, 7 How, 311; Lyon v. Knott, 4 Cush. 548; Rabb v. Griffin, 4 Cush. 579; Varner v. Gregg, 4 Cush. 590; Clarke v. McCreary, 12 S. & M. 347.

The husband's right, before reduction to possession, was contingent and qualified, and not a vested right, and could therefore be taken away by statute passed after marriage, and before he recovered possession. Clarke v. McCreary, 12 S. & M. 347.

There is a distinction at common law between choses in action belonging to the wife, at the time of the marriage, and those accruing to her during coverture, so far as respects the right of the husband in them. In the former case, the wife must be joined with the husband in an action for their recovery, and if they be not reduced to possession during coverture, the right remains in the wife, though, if she die, the right survives to the husband. In the latter, the choses in action are the absolute property of the husband, whether reduced to possession or not, and the husband may sue for them alone. Wade v. Grimes, 7 How, 425; Harper v. Archer, 4 S. & M. 99; Clarke v. McCreary, 12 S. & M. 347; Cook v. Lindsey, 34 Miss. 451; Henderson v. Guyot, 6 S. & M. 209.

By the common law, the husband is entitled, during coverture, to the usufruct of the wife's realty, and he may lease the same during the coverture. This rule is not changed by the Act of 1839, and since that time, as before, the rents of the wife's realty are subject to be applied to the husband's debts. Baynton v. Finnall, 4 S. & M. 193.

And where the wife has a life-estate in lands, which is terminated by her death, whilst there is a growing and ungathered crop, the husband is entitled to the emblements. Hall v. Browder, 4 How, 224.

Slaves received by a wife prior to the Act of 1839 became the property of the husband, and he could not, as against his creditors, pay his wife hire therefor. Money of the wife received by him after that, in 1842, was her property, and he had the right to repay it to her or her children, with one year's interest thereon. Hence, a conveyance by the husband, after his wife's death, to his children, in 1865, on consideration of such money and the hire of slaves, is, as against his creditors, supported by a valuable consideration as to the money, but voluntary as to the hires. Willis v. Gattman, 53 Miss. 721.

of his death. By his will he bequeathed to his wife the residence and an annuity of $1,000 a year during her life, and a legacy of $1,000 to his grandson, Adam Gordon Calhoun. The remainder of the estate was given to his two children, Christiana Calhoun, wife of James E. Calhoun, and her brother, who died before the testator, so Mrs. Christiana Calhoun thus became the sole heir of Adam Gordon. James E. Calhoun was married to his wife before the death of Adam Gordon. Some time after the death of Adam Gordon, Passmore Hoopes became insolvent, and a compromise was entered into with him by the executor of Adam Gordon's will, whereby the land was reconveyed by Hoopes to Mrs. Alethia Gordon, the executor, in consideration of the surrender of the notes Hoopes had given for the balance of the purchase money, and the payment to him of about $15,000 in money. Appellant claims the land as the daughter and only heir of her mother, Mrs. Christiana Calhoun. Appellees claim under conveyances from James E. Calhoun.

APPEALED from Circuit Court, Claiborn county, J. B. CHRISMAN, Judge.

Affirmed March 26, 1883.

*Attorneys for appellant, Martin & McLaurin.*

*Attorney for appellee, E. S. Drake.*

Brief of Martin & McLaurin.

The will of Adam Gordon, after giving to Alethia Gordon an annuity of $1,000.00 for her life, to be paid generally out of the estate, and a life-interest in the homestead and certain slaves, gives the entire balance of the estate, real and personal, to the said Christiana G. Calhoun and a brother of hers, one P. W. Gordon (who, as was subsequently discovered, died prior to the death of Adam Gordon), to be divided equally between them upon the death of the said Alethia Gordon, who, by the will, was made executrix, together with two other persons, neither of whom ever qualified or acted as executors. The will also gave Adam Gordon Calhoun a certain legacy of $1,000.

In addition to the homestead, which is not considered in this

case, the property of Gordon consisted of five promissory notes of one Passmore Hoopes, one for $4,667.80, the other four for $14,417.80 each.

The purchase of the property in controversy was made by Hoopes prior to the death of Adam Gordon, and in payment Hoopes gave the said four notes, due respectively on January 9, 1838, 1839, 1840 and 1841. Soon after Adam Gordon's death, Alethia Gordon, his executrix, learning that Hoopes had become insolvent, in order to secure the large debt due the estate by Hoopes, and after having consulted Calhoun and wife, repurchased, with their full approbation, the lands in controversy, and gave in payment therefor the four notes and her individual note for $————, with James E. Calhoun as security, and took the deed in her own name, though, as she always contended, in trust for the estate of Adam Gordon.   *   *   *

Upon the death of Adam Gordon, this property was in the form of the four notes. These notes were for the *purchase money of the lands in controversy,* and have with them the *vendor's lien.* Hoopes, upon becoming insolvent, consented to resell the lands. The whole transaction was a *foreclosure in pais* of the vendor's lien on the lands; it was, in effect, a foreclosure of the vendor's lien and a sale for the purchase money, at which sale the first vendor, Mrs. Gordon, became a purchaser.

This raises a question as to the character of the property in the four notes at the time of Adam Gordon's death, though this property was in form four promissory notes, yet they represented the purchase money of the lands, and upon certain contingencies, *i. e.,* the failure of Hoopes to pay, the sale of the lands under the vendor's lien, the failure of some third person to buy, and the necessary purchase by the executors of the original vendor, were to be considered real property.

It will not be contended that, ordinarily, the change in form of the property by an executor will at all affect its character as regards the line of descent, but in this case we contend that the rule is not applicable. The *notes were really converted into real estate,* because: First, every person at all to be affected by the change in the character of the property was consulted and agreed to the purchase of the lands. Second, Calhoun admits the conversion into real estate. This is proven in a variety of ways. He

nowhere denies the charges made in the two bills of complaint that the conversion was made with his approval; he goes even further than this in his answer, *sworn to,* to Mrs. Ross' bill. He says he "went upon the place at Mrs. Gordon's request, his inducement to do so, instead of engaging in business on his own account, was that he considered that all of said property belonged to his wife, and it was, therefore, to her interest that it should be properly managed, etc." The above admissions were made under such circumstances as to be entitled to great weight—they were made in 1860—made *after* the suit with Mrs. Gordon, involving all questions of *title* to the property, made in the most solmen manner, *i. e., under oath,* in answer to a bill claiming title to the property. They show that he did not regard the lands as representatives of the notes, *i. e.,* a chose in action reduced to possession, and his property, in which his wife had no interest, but as real estate really belonging to his wife.

The rule of law, which ordinarily stamps upon property purchased with the funds of an estate, the character which the property of the estate given in exchange bore, is intended to preserve to each heir of a decedent the interest which he took in the estate by reason of the death or will. The conversion of the notes into real estate in this case does no violence to this rule, because every person interested consented to the change in the character of the property.

Mrs. Gordon, *charged with the execution* of the will, took the property in trust for the estate in order that the *will might be executed.*

Mrs. Calhoun could have had no interest whatever in the notes if they were choses in action. And Calhoun, the ony one to be seriously affected by the conversion, *i. e.,* in reducing his interest from an absolute ownership reducing the property in possession, to an estate for life by the courtesy, consented to the conversion. There were motives, too, for the conversion. Hoopes' notes were not due, and his standing financially was ruined; here was an opportunity to save the property without delay; again Calhoun thereby deprived himself of nothing, as he could enjoy the property for life, and as his children were also the children of Christiana Calhoun, it is not reasonable to suppose that he objected to the *fee* of the property remaining in his wife, as it was finally to be inherited by his children.

It was evidently the intention of the will that Mr. Gordon's son and daughter should have the fee in all his property; had Calhoun reduced the notes to possession as a chose in action, this would have defeated the will, but by the conversion the fee of the property was retained in the heirs of Christiana Calhoun.    *    *    *

Even should it be held that the character of the property was never changed, we think that appellant's claims to the property should prevail. Did Calhoun, during the lifetime of his wife, reduce the property to possession as a chose in action ? We answer that he did not. His wife died in 1838, and Mrs. Gordon died in 1844, and the will provided that the property was to be kept together until the death of Mrs. Gordon; the will further provides for Mrs. Gordon's annuity, which was a charge upon the property. To protect this charge, and insure its annual payment, Mrs. Gordon was, by the will, made executrix, and the property required to be kept together until her death; hence we say that, no matter what interest Mrs. Calhoun had in the property, there was a certain special estate carved out of the fee in favor of Mrs. Gordon, and that Mrs. Gordon alone had the right to say whether she would retain the security for this special estate guaranteed her by the will, or accept some other security. The facts of the case are that she did accept some other security and deliver possession of her property, but not without having first exercised her right of retaining possession or delivering it up—not a chose in action, but upon such terms as she saw proper to dictate.

The terms dictated are fully set out in the written agreement under which Calhoun took possession. We contend that this written agreement was a contract between Mrs. Gordon and Calhoun, defining, first, the terms upon which Calhoun was to take possession and occupy, and, second, defining the *character of the property* of which he was to take possession.

If this reasoning be good it shows conclusively that Calhoun did not take possession of the property as a chose in action, and that he must now abide the character impressed upon the property by the terms of the contract, he having been a party to same, and now estopped by the conditions thereof.    *    *    *

The legal title being in Mrs. Gordon, the possession was delivered by her to Calhoun as her agent. He held under her, and is estopped from denying her title. He was a tenant at suf-

ference to Mrs. Gordon and her heir, Mrs. Ross, the appellant. Wildy *v.* Bonny, 26 Miss. 38.

This interest cannot be transferred. 4 Kent, 117.

Neither Calhoun or those holding under him can assert any title against appellant without first yielding possession. Griffing *v.* Sheffield, 38 Miss. 390.

Calhoun was agent for Mrs. Gordon by his permissive occupancy, and trustee of the estate of Adam Gordon as administrator. It is the duty of the trustee, if he intends to claim the estate, to resign his trust and deliver possession. 2 Perry on Trusts, 493; Shields *v.* Atkins, 3 Ath. 560; Prumpfort *v.* Windsor, 2 Ves. 476; Huntley *v.* Huntley, 8 Ind. Eg. 250.

The same rule applies to agents. 2 Perry on Trusts, 494.

The attitude of the trustee must be hostile and continuously so, and such adverse claim must be brought home to the knowledge of the *cestui que trust* beyond question of doubt, and there must be no mistake or misapprehension as to the holding by either party. 2 Perry on Trusts, 495; 4 How. 295; Scott *v.* Haddock, 71 Geo. 258; Moffet *v.* Bingham, 11 Humph. 369. * * *

Should it be held that the character of the property remained the same, we insist that the husband's right to the personal property of his wife, not reduced to possession, is contingent and qualified, and not a vested right in him, and could be taken away by a statute passed before he reduced the property to possession.

Clark *v.* McCrary, 12 S. & M. 349. And possession by a husband of a wife's distributive share, by permission of administrator, is no reduction of the wife's share to his possession.

By Act of 1839, a married woman was permitted to hold property in her own name, as of her own property, and as Mrs. Gordon was still alive when this act was passed, and Calhoun only held property in possession under her as executrix, this would cast the descent upon Mrs. Calhoun's heir at law (appellant), for at the time the Act of 1821, Hutch. Code 623, was in force, providing that personalty shall descend as real estate, the law of real estate being that it should descend first to children of intestate, in our case to appellant, as the then only living child of Mrs. Calhoun. Hutch. Code, p. 655, section 54, does not recognize husband as next of kin, but only prefers him in administering; if he were recognized as next of kin, then he would have taken the

entire personal estate, and such has never been the law in this State. Again, there never was a time in the State when an administrator was permitted to hold funds or property of an estate after payment of debts, but the law has always required distribution.

Brief of E. S. Drake:

Plaintiff deraigns title through her grandmother, Alethia Gordon. Her chain of title is short, to wit: deed from Adam Gordon to P. Hoopes, June 16, 1836. Deed from P. Hoopes to Alethia Gordon, May 2, 1837. Admission that Alethia Gordon died in August, 1844, and that plaintiff is her granddaughter and sole heir at law.   *   *   *

Defendant shows a complete equitable title in James E. Calhoun to the lands in controversy—she claims under said Calhoun with actual continued possession of said lands by him and those claiming under him (she being the last) from 1837 to the present time, under said complete equitable title.   *   *   *

As to the equitable ownership of James E. Calhoun of the lands in controversy, it will doubtless be readily admitted by counsel for appellant that a trustee, holding a mere naked legal title, cannot prevail, even in ejectment, against the *cestui que* trusts. And the same is true of the heir of the trustee against those claiming under the *cestui que* trust. Brown *v.* Doe, *ex dem.* Weast, 7 How. 184; Heard *v.* Baird, 40 Miss. 793.

If, then, Mrs. Alethia Gordon held title as trustee, and that trust is satisfied as to her and all others save Calhoun, then neither she nor her heirs can prevail against Calhoun or those claiming under him.

Let us examine the facts and see whether Mrs. Alethia Gordon held the title to these lands in trust, and if so, whether the trust has been satisfied as to all parties except James E. Calhoun, or, in other words, whether said Calhoun was the *real owner*. Was Mrs. Gordon merely a trustee of the naked legal title to the lands in controversy? About this there can be no doubt. The facts show that she took the title to the lands in controversy in payment of the notes of Hoopes to Adam Gordon. This fact of itself would make her a trustee of the naked legal title for the benefit of the estate of Adam Gordon. But aside from this fact, she herself twice swore that she held the title in trust for the estate of Adam Gordon. The plaintiff also, in her bill against James E. Calhoun,

filed in the Chancery Court of Claiborn county in 1860, makes a similar averment. Calhoun, in his sworn answer to said bill, makes a similar averment. In fact, there is no denial of the fact that she held the legal title in trust for Adam Gordon's estate.

Was James E. Calhoun the real owner of the land in controversy? Or, in other words, was he the *cestui que trust?* We answer, beyond doubt he was. The authorities, without dissent, lay down this rule, and it will not be denied here, that prior to the Married Woman's Act, Act of 1839, the "choses in action of the wife, reduced to possession by the husband," during coverture, become his absolutely. The following facts are all either admitted or proved, and not controverted: Adam Gordon died in August, 1836. The bulk of his estate consisted of the Hoopes' notes. He left a will in which, after making sundry legacies, he bequeathed the remainder of his estate to his two children, P. W. Gordon and Christiana Calhoun, wife of James E. Calhoun. It is admitted that P. W. Gordon had died in January, 1836, before his father, hence Christiana Calhoun became his sole heir, subject only to the legacies. During the lifetime of Christiana Calhoun, in May, 1837, Mrs. Gordon converted the Hoopes notes into the land in controversy (and certain slaves), and in June, 1837, Mrs. Gordon put Calhoun in possession of the said lands and slaves under a written agreement. Thus the "choses in action" of Mrs. Christiana Calhoun, to which she was entitled by the will of Adam Gordon, were "reduced to possession" by James E. Calhoun before the death of his wife, which occurred in 1838, and before the passage of the Married Woman's law in 1839. Hence Calhoun became the real owner of the land into which the Hoopes notes had been converted. The change of form of the property could not change its *character* for purposes of descent. Mrs. Gordon avers in her report to the probate court and in her bill in chancery against James E. Calhoun, Mrs. E. C. Ross in her bill against Calhoun, and Calhoun in his answer to said bill, all say that the *character* of the said property for purposes of descent was not changed by its change of form. Further, it was evidently the intention and desire of Adam Gordon that the bequests to Mrs. Christiana Calhoun (including the P. W. Gordon half, which was also hers by operation of law) should remain in the shape of choses in action, for the will provides that as fast as the Hoopes

notes are collected the money shall be invested in stocks and bonds. Counsel for appellant contend that as the change was made in the form of the property from notes to land, by consent of all parties, therefore its character was also changed, and it became real estate. This position is untenable, because it assumes a fact not proved, and because it deduces from the assumed fact a conclusion that does not necessarily follow. There is no evidence whatever to show that either Adam Calhoun or Christiana Calhoun consented, and they were both interested. The only evidence of consent at all is found in the bill of Mrs. Gordon against Calhoun and the bill and answer in Ross *v.* Calhoun, in which it is said that the change in the form of the property was made with the consent of James E. Calhoun, and the allegation of consent in both cases is coupled with the further allegation that the character of the property was in no wise changed by the change in its form, but remained for all purposes of descent *personalty.* But, say counsel for appellant, this latter allegation is a mere conclusion of law and amounts to nothing, and in the court below hosts of authorities were cited with no bearing on the question. It is no doubt true that a mere recital of a conclusion of law does not make that recital law, and I take it no lawyer will contend it does. But this is not the character or rather nature of the recital above, and if it were purely a recital of a conclusion of law, it would recite a correct conclusion of law. An executor cannot change the character of assets by change of form. But this recital is clearly a recital of the *intention* of the parties making the change, to wit: that Mrs. Gordon and Mr. Calhoun were willing to change the form of the property from notes to land, in order to prevent its being wholly lost to the estate by the insolvency of Hoopes, but were not willing to change its character. The change in form had become necessary (so Mrs. Gordon alleges) owing to the insolvency of Hoopes. Besides, Mrs. Gordon and Calhoun could not have changed the character of the assets without the consent of all parties interested. Two were incapable of consenting, Christiana Calhoun, a *femme covert,* and Adam Calhoun, an infant. I cannot see, however, that the plaintiff would be benefited even had the character of the property been changed, as will appear in the discussion of other points in the case. But it is contended by counsel for appellant, that as possession of the prop-

erty was, by the will, postponed till the death of Alethia Gordon, which occurred in 1844, therefore Calhoun could not lawfully get possession until the latter event, and that his wife, having died in 1838, it was impossible for him to reduce this "chose in action" to possession during coverture. Certainly this conclusion does not follow from the premises for two. reasons. First, because the postponement of possession, or rather division, of the property was solely for the benefit of Mrs. Alethia Gordon (practically the sole executrix), and she, being neither infant, idiot nor *femme covert,* could waive any right given her by the will, and she did waive the right to possession by delivering possession to Calhoun in June, 1837. Second, because, by the will, the executor had power to make such advancements to P. W. and Christiana as they might deem expedient during the lifetime of Alethia. P. W. Gordon being dead, unmarried and intestate, and Alethia Gordon being sole acting executrix, deemed it necessary and expedient to advance, and did actually advance, the entire estate to her daughter, Christiana, and put her husband, J. E. Calhoun, in possession in June, 1837, subject only to the payment of the legacies and debts. This she might lawfully do under the will and did do, as is apparent from the undisputed fact that she put Calhoun in possession in 1837, subject to the payment of legacies; and also from her sworn statement in her bill against Calhoun, filed in the Superior Court of Chancery in 1843, in which she avers that she put him in possession in order to provide a home for Christiana and her family, and to prevent Calhoun from removing to Texas, as he then contemplated doing.

But to make this clearer, it will not be denied that postponement of possession, or division, being solely for Mrs. Gordon's benefit, she could sell out, if she chose, to Calhoun. Virtually she did sell out. She put Calhoun in possession under a written agreement in which it is stipulated that Calhoun is to pay certain sums of money; first, four notes to P. Hoopes, aggregating over $15,000; second, Mrs. Gordon's dowry, $1,000; third, legacy to A. G. Calhoun, $1,000; fourth, debts of estate, say $700. The payment of these sums by him was the consideration for the assignment of the possession, as well as other personal considerations. All these sums have long ago been paid; some voluntarily by Calhoun and the remainder were recovered by E. C. Ross in her chancery suit against Calhoun.

The legacy to Christiana Calhoun was not a contingent legacy which could be defeated by the happening of any future event. The entire residuum *vested absolutely* in her upon the death of Adam Gordon. Possession only was postponed by the will, and that was postponed solely for Mrs. Gordon's benefit, and she having waived her right by putting Calhoun in possession in 1837, of the land, it became absolutely his for all time to come, subject only to the payment of the debts and legacies; all which, it is admitted, were paid years ago. That the legacy of the residuum *vested,* upon the death of Adam Gordon, is apparent from the will. Scott *v.* James, 3 How. 312.

But, say counsel for appellant, Calhoun could not get possession till after Mrs. Gordon's death, "because the property had to be divided," and could not be divided till the settlement of the estate, or at least till after Mrs. Gordon's death. In the light of the facts we may well ask, between whom must it be divided ? P. W. Gordon died before his father, and hence the entire residuum vested absolutely in Christiana Calhoun, and there was no one for her to divide with, so that Calhoun only needed Mrs. Gordon's permission to take possession of the property, and he got that permission, and having taken possession during the lifetime of his wife, before the passage of the Married Woman's law, it became absolutely his property, subject only to the payment of the debts and legacies. The debts and legacies, it is admitted, were all paid years ago. Mrs. Alethia Gordon held the legal title in trust for the estate of Adam Gordon, by deed from P. Hoopes. The trust has been fully satisfied as to all save Calhoun, hence he is the real owner, and the heirs of Mrs. Gordon (the sole heir being the plaintiff, E. C. Ross) cannot prevail in ejectment against the defendant, who claims under Calhoun. Plaintiff makes no claim and shows no muniment of title, save the deed from P. Hoopes to Alethia Gordon, and the character of that deed has been fully demonstrated. Even though defendant and those under whom she claims could show a possession of only one instead of forty years, yet plaintiff could not prevail against her.

But suppose that Calhoun had not reduced the property to possession during the life of his wife, Christiana (and he most certainly did reduce it to possession with consent of the sole acting executrix), would his rights have been thereby defeated ? We

think not. The legacy of Adam Gordon to Christiana Calhoun (which contsituted the entire residuum, P. W. Gordon having died before his father) was *"a chose in action of the wife accruing during coverture."* A distinction is made by jurists between choses in action accruing and vested *before coverture,* and those accruing and vested *during coverture.* In the former case he must reduce to possession during the life of his wife, or the heirs of the wife will inherit. In the latter case, he takes, whether he reduces to possession or not, *provided he survives the wife.* Of course I refer to the law as it existed prior to 1839. Here is the case of a chose in action which accrued and vested during coverture and the husband, James E. Calhoun, survived the wife. His right to take, in such circumstances, has always been conceded—the dispute among jurists has been, *how* he took, whether as *next* of *kin* or *jure marati.* This principle is recognized by our high court in the cases of Lowry *v.* Houston, 3 How. 395 *et seq;* Wade *v.* Grimes, 7 How. 433 *et seq;* Harper *v.* Archer, 8 S. & M. 232.

It has been held that during the life of the wife, the husband *may sue alone* for choses in action accruing during coverture. Henderson *v.* Guyot, 6 S. & M. 211; McGee *v.* Ford, 5 S. & M. 769.

The Act of November 26, 1821, recognizes the husband as next of kin to the wife, and this statute was in force at the time of the death of Christiana Calhoun. See Hutchinson's Code, p. 655, § 54.

Who are the "Representatives"? Of course the next of kin or distributees, *"preferring first the husband or wife."*

It will not do to say that because Mrs. Gordon did not die till after the Act of 1839 went into effect, and because possession was postponed by the will until after her death, that therefore the rights of the parties must be determined by the Act of 1839. For the estate *vested* in Christiana Calhoun at the death of Adam Gordon in 1836, and she died in 1838. Her husband's rights as survivor vested absolutely upon her death. What the rights of the parties were *then* is the question for the court to determine *now.* Thompson *v.* Thomas, 30 Miss. 158.

The case of Clark *v.* McCreary, 12 S. & M., cited by appellant, does not apply. In that case, McCreary and wife did not come into posesssion of the property till September, 1839, when the Married Woman's law was in force. Mrs. McCreary did not *die*

till 1842. Suppose Mrs. Gordon had died before her daughter, Christiana, say in 1837, and Calhoun had thereupon gone into possession of the land into which she had converted the notes of Hoopes. Counsel will readily admit that in such case, the property would have become his, subject only to the payment of the debts and legacies. I can see no difference between the case last put and the case as it actually existed, except that in the former he would have been saved the payment of Mrs. Gordon's annuity from 1837 to 1844, while in the latter case he had to pay it.

Thus I think it is beyond question that James E. Calhoun was the real or equitable owner of the lands in controversy, and that his title passed to the defendant by means of conveyances. Hence upon this ground of defense alone judgment was properly for the defendant.　*　*　*

OPINION.—COOPER, J.:

It appears from the admitted facts that James E. Calhoun and Christiana Gordon were married before the death of Adam Gordon, the testator. The interest of Mrs. Calhoun, therefore, under the will of her father, accrued to her after her marriage, and in such cases the property, before the passage of the Act of 1839 in relation to the property of married women, passed absolutely to the husband, whether reduced to possession or not during the coverture. Wade v. Grimes, 7 How. 425; Harper v. Archer, 4 S. & M. 99; Clarke v. McCreary, 12 S. & M. 347; Cook v. Lindsey, 34 Miss. 451; Henderson v. Guyot, 6 S. & M. 209.

The real estate, then, into which the land notes of Hoopes were converted was acquired by an investment of the property of James Calhoun, and not that of his wife, and it becomes immaterial to inquire whether he believed it to be his own or that of his wife—his mistake could not change the law.

The decision on this point is conclusive upon the claim asserted by the appellant, and it is unnecessary to consider the other questions presented by the record.

*The judgment is affirmed.*